IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

SHAWNEE TERMINAL RAILROAD      )
CO., INC.                      )
                               )
        Plaintiff,             )
                               )
v.                             )        Civil Action No. 09-0113-KD-N
                               )
J.E. ESTES WOOD CO., INC., et al.,  )
                               )
        Defendants.            )

SUPPLEMENTAL REPORT AND RECOMMENDATION

This matter is before the court on two Motions to Dismiss (docs. 5 and 24) for Lack of

Subject Matter Jurisdiction, and accompanying briefs filed by defendants J.E. Estes Wood Co.,

Inc., and A.A. Nettles, Sr. Properties, LTD.  This matter has been referred to the undersigned

Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  The

undersigned has previously entered a Report and Recommendation (doc. 18) which addressed

defendant's "first" Motion to Dismiss,  finding no jurisdiction and recommending dismissal of

the action.  Because of the subsequent filing of an Amended Complaint (doc. 19) and a new

Motion to Dismiss, the undersigned finds it appropriate to supplement its prior findings and

proposal for disposition of this case.  Upon consideration of the motions to dismiss, the

accompanying briefs in support and in opposition, the briefs of the parties on the plaintiff's

objections to the first Report and Recommendation, and the record as a whole, the undersigned

RECOMMENDS that this action be dismissed for lack of subject matter jurisdiction.

Procedural Background

Within four days after the entry of the original Report and Recommendation (doc. 18) for

lack of subject matter jurisdiction (doc. 5), plaintiff filed its First Amended Complaint(doc. 19).[1]

Plaintiff then filed its Objection (doc. 21) to the Report and Recommendation and the parties

began re-briefing the jurisdictional issues previously exhaustively briefed by the parties. (See

parties' briefs concerning objections to the report and recommendation, docs. 21, 28, 32, 33 and

35)

Shortly after the amended complaint was filed, defendants filed a second Motion to

Dismiss (doc. 24), addressing the First Amended Complaint and arguing that the court need not

withdraw its original Report and Recommendation under the facts of this case.  The court notes

that the Amended Complaint is almost identical to the original Complaint, containing only slight

differences in the jurisdictional allegations and few, if any, other changes of any substance.

Plaintiff has not filed a motion seeking withdrawal of the original Report and

Recommendation or suggesting that it is moot.  Indeed, plaintiff continues to treat the original

Report and Recommendation as valid and viable (though allegedly flawed); STR filed three

briefs in support of its Objections as well as a response to the new motion to dismiss, never

---

[1]  Defendants had filed the Motion to Dismiss in lieu of an Answer to the original
complaint.  Rule 15 of the Federal Rules of Civil Procedure allows a party to "amend its
pleading once as a matter of course ... before being served with a responsive pleading."
Fed.R.Civ.P. 15(a)(1).   "For the purposes of this Rule, the term "responsive pleading" does not
include such filings as a motion to dismiss or a motion for summary judgment."  Brewer-Giorgio
v. Producers Video, Inc., 216 F.3d 1281 (11th Cir. 2000).  Rule 15(a) "guarantee[s] a plaintiff an
absolute right" to amend the complaint once at any time so long as the defendant has not served
a responsive pleading *and the court has not decided a motion to dismiss*." James v. Hurson
Assocs., Inc. v. Glickman, 229 F.3d 277, 282-83 (D.C.Cir.2000) (internal quotation removed,
emphasis added).  In this instance, the court had not finally decided the original motion to
dismiss, though the Report and Recommendation had been entered.  Defendants have not
challenged plaintiff's right to file the Amended Complaint.  In light of the recommended
disposition of this action, the court finds it unnecessary to definitively determine whether the
amended complaint was properly filed without leave of court.

2

challenging the continuing validity of the original Report and Recommendation in light of the amended complaint.  The court thus finds that it is not necessary to withdraw its original Report and Recommendation, but nonetheless finds supplementation to be appropriate.  The parties will, of course, be allowed to file supplemental objections and to respond to the issues addressed in this supplement.

<u>Factual Background</u>

The court has previously made findings of fact in its original Report and Recommendation.  Except as stated herein, those findings are incorporated in this Supplemental Report and Recommendation.  The undersigned corrects the following facts stated in the original Report and Recommendation:

● Plaintiff Shawnee Terminal Railroad Co., Inc., (hereinafter "STR")  is not a holding company, but is a short line railroad; it is a short line railroad company and a wholly-owned subsidiary of Pioneer Railcorp, which is a non-carrier holding company.  (See doc 6, exhibit B.)[2]

● As previously found, plaintiff has railroad operations in two states, Alabama and Illinois; its <u>Alabama</u> operations are based in Monroeville, Alabama.[3]

● Plaintiff asserts that STR has a total of 63 miles of track, including approximately 60.5 miles in Alabama and 2.5 miles of track in Illinois; however, as defendants point out in their Brief (doc. 6 at 18 and exhibit B) in support of the original Motion to Dismiss, plaintiff has

---

[2]  The distinction does not benefit plaintiff in the jurisdictional analysis.  (See infra at 16 and n.13).

[3]  This is consistent with the analysis in the original Report and Recommendation, though it may clarify one statement in that document.

elsewhere stated facts which may indicate a different figure.[4]  The undersigned notes that the record does not conclusively demonstrate which figure is correct, but for purposes of the instant analysis of the jurisdictional issue, the undersigned shall utilize the lower figure.

The court also finds that plaintiff filed a substantively identical complaint in the Circuit Court of Monroe County, Alabama, two days after filing the complaint in this court.  That action remains pending.  This fact does not, as suggested by defendants, prove that this court lacks jurisdiction; at most it may indicate plaintiff's recognition of potential jurisdictional problems in this court.

<u>Legal Standards</u>

The statement of the applicable legal standards contained in the original Report and Recommendation are incorporated herein by reference.  Supplemental citation to and analysis of the legal precedents most relevant to the issues addressed herein are provided in the context of the appropriate analytical discussion.

---

[4]  According to the Carr affidavit (doc. 11, exhibit 5), the merger was completed in January of this year.  In a filing to the Surface Transportation Board of the U.S. Department of Transportation dated **January 30, 2009**, STR indicated that it expected to complete a merger by February 15, 2009, and that the merging parties included STR, Alabama Railroad Co, and another short line railroad, Alabama and Florida Railway Co., Inc.  The filing states that Alabama Railroad Co. operated approximately 60 miles of track in Alabama, and that Alabama and Florida Railway owned 42 miles of track, all of which is located in Alabama.  Plaintiff's statements in its Response to the Motion to Dismiss, that Alabama Railroad Co. merged with STR in January, seem to be at odds with the regulatory filing, both as to the time of the merger and the contents of the new company; there is no explanation of the differences concerning time of the merger, and saying that STR and Alabama Railroad merged does not conclusively demonstrate that Alabama and Florida Railroad did not also merge at that time or thereafter, which would add 43 miles of additional track to STR's operations in Alabama.

As it appears that the merger did not take place until sometime after January 1, 2009, and likely after January 30, 2009, plaintiff's intransigence on its argument that only income since the merger is relevant is misplaced;  the year-to-date income figures which plaintiff <u>has</u> provided extend significantly beyond the period since the merger.

4

<u>Analysis</u>

*<u>Federal Question Jurisdiction</u>*

Plaintiff's original complaint contained allegations of jurisdiction under both federal question, 28 U.S.C. §1331, and diversity of citizenship provisions, 28 U.S.C. §1332.  The Report and Recommendation addressed the issue of federal question jurisdiction, finding that the citation to a federal criminal statute, 18 U.S.C. § 1992(a)[5], the inclusion of a purported civil claim under that criminal statute, and citations to "public policy" and the Interstate Commerce Act were insufficient as a matter of law to establish the existence of federal question jurisdiction. In light of the changes to plaintiff's jurisdictional allegations in its Amended Complaint and its renewed focus–in its response to the defendants' second Motion to Dismiss–on federal question jurisdiction and supplemental jurisdiction over the state law claims, the undersigned briefly revisits this issue.

As defendants note, <u>plaintiff did not challenge</u> the undersigned's findings of fact or conclusions of law concerning the lack of federal question jurisdiction, but has certainly attempted to resurrect this argument in later filings; it appears, on initial review, that plaintiff may be correct that this matter has not been 'abandoned' by the failure to object, but rather that plaintiff is only precluded from challenging the relevant findings of fact. See doc. 34 at 13-14. However, plaintiff has not altered or supplemented its arguments concerning the existence of

---

[5] 18 U.S.C. §1992 is entitled "Terrorist attacks and other violence against railroad carriers and against mass transportation systems on land, on water, or through the air."  This section requires–ordinarily under a criminal standard of proof–a finding that the act was done wilfully.

federal question jurisdiction.[6]  The undersigned has previously stated her conclusion that plaintiff

states no federal claim and no state claim which raises "substantial issues of federal law,"

sufficient to justify the exercise of federal question jurisdiction,  Dunlap v. G&L Holding Group,

Inc., 381 F.3d 1285, 1290 (11th Cir. 2004).  Accordingly, the undersigned finds it unnecessary to

make a final determination what the effect of plaintiff's failure to object to the portion of the

Report and Recommendation which dealt with federal question jurisdiction may have on its

ability to further argue that issue.  The undersigned RECOMMENDS that the court find no

jurisdiction under the federal question theory of jurisdiction nor supplemental jurisdiction related

to such purported federal claim.

*Diversity of Citizenship*

      *A. The Burden of Persuasion and the Presumption Against Jurisdiction*

The party asserting federal jurisdiction–in this case, the plaintiff–has the burden of

establishing it.  DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 342, n.3 (2006).  Federal courts

apply a presumption that they "lack jurisdiction unless the contrary appears affirmatively from

the record."  Id. (quoting Renne v. Geary, 501 U.S. 312, 316 (1991)).

The court may thus decide against the exercise of jurisdiction on an incomplete record,

but may not find that jurisdiction exists without a thorough understanding of the reality behind

the labels. As the Seventh Circuit has pithily noted, a federal court's obligation to resolve

---

    [6] Plaintiff's Response (doc 34) to the Second Motion to Dismiss focuses on supplemental
jurisdiction over plaintiff's state law claims, in the event that the court finds that it has
jurisdiction over plaintiff's purported federal claim.  Supplemental jurisdiction does not exist
without a valid basis for the exercise of federal question jurisdiction.  As there is no such basis,
the undersigned finds the discussion of supplemental jurisdiction to be nothing more than an
academic exercise, irrelevant to the case at bar.

jurisdictional questions is not without limitation:

> These lawyers knew what they had to do, and they did not do it. Failure in one round of supplemental filings leads us to doubt that a second would be any more successful. Anyway, it is not the court's obligation to lead counsel through a jurisdictional paint-by-numbers scheme. Litigants who call on the resources of a federal court must establish that the tribunal has jurisdiction, and when after multiple opportunities they do not demonstrate that jurisdiction is present, the appropriate response is clear. Counsel has only themselves to blame if they must now litigate this case from scratch in state court.

Guar. Nat. Title Co., Inc. v. J.E.G. Associates, 101 F.3d 57, 59 (7th Cir. 1996)(remanding *with instructions* to dismiss for lack of jurisdiction rather than allow amendments).

In the instant case, plaintiff has control of all facts related to its business operations and citizenship. Plaintiff has limited the facts it presents to only those particular facts and conclusions that tend to support its claim of diverse citizenship. For example, Carr states that STR "is a member of the American Short Line and Regional Railroad Association, which is a national organization, and interchanges cars, through other carriers, with the entire North America freight rail network." Doc. 11, exh. A at 2. Despite criticism in the Report and Recommendation of the lack of detail provided concerning STR's actual involvement in such interchanges, plaintiff has not offered any supporting or explanatory details in any of its subsequent filings. It has gone so far as to criticize the undersigned's unwillingness to take this bald statement as significant evidence that STR is not primarily an Alabama railroad company.[7]

---

[7] "Finally, the Magistrate Judge also disregards (in footnote four) the evidence that STR is a member of the American Short Line and Regional Railroad Association, stating that the "membership alone has little relevance." Id. What the court actually said was "plaintiff does not indicate how often, if at all, STR has availed itself of this service. The membership itself has little relevance to the determination of the company's principal place of business." Doc. 18, n.4. Rather than provide the missing details, Plaintiff went on to restate that it was a member of the Association and 'clarify' for the court that STR, not the Association, "interchanges cars with the continental freight network." Doc. 21 at 5-6. As the undersigned initially noted, such

(Doc. 11, Exhibit A at 5)  Further, despite having been repeatedly challenged for failing to

provide income information for its activities in Alabama and Illinois for a reasonable period of

time, plaintiff has chosen to dig in its heels and rest on the limited income information provided.

Rather than provide the information cited by the court, either in its objections to the Report and

Recommendation or in response to the defendants' Second Motion to Dismiss, plaintiff argues

repeatedly that, because two sister subsidiary companies merged in January of this year, STR has

no duty to go back farther.  However, while plaintiff correctly asserts that it has no absolute duty

to present *any* evidence in support of its claim of jurisdiction, such tactics can leave the court

without sufficient detail in the record to overcome the presumption against jurisdiction so as to

find in plaintiff's favor on this issue.[8]  That is the situation in this case.

_____

'clarification' was not necessary and missed the point.

   [8]  In its Brief in Support of its Objections to the Report and Recommendation, plaintiff
takes the undersigned to task for making this point.  Doc. 21at 4-5.  Plaintiff cites numerous
cases for the importance of relative income information in determining the citizenship of a
corporation.  Id. at 5 and note 3.  Given the unquestioned importance of this information,
plaintiff's decision to limit the record on this point is particularly surprising, and its position that
the court must find in its favor in the absence of evidence of the relative income derived from
Alabama and Illinois operations during a period when the Alabama operations were *in operation*
appears to be a tactical decision.
   The most glaring problem with this argument is that plaintiff is suing defendant for lost
income for two-year period in the years 2007, 2008 and part of 2009, arising from a "hole" in the
middle of its railroad line in Alabama, which presumably precluded any income from operations
in this state since the fire.  Indeed, Plaintiff claims losses due to the destruction of the bridge and
surrounding track, "loss of use, loss of income, inability to perform its common carrier
obligations, and other associated costs and expenses" (docs. 1 at 5, and 19 at 5) in the amount of
1.8 million dollars.  The fire at issue occurred on or about March 7, 2007, two years before
plaintiff filed its Complaint on March 4, 2009.  Plaintiff states that its income from Alabama in
the first two months of this year–the only figure plaintiff has provided–is a net operating loss of
$9,000.  Plaintiff persists in comparing this meaningless figure to its net income in Illinois for
the same period–alleged to be  $58,000 for the first two months of this year.
   Presumably, some of the 1.8 million dollars claimed as damages are for replacement of
the bridge and track destroyed in the fire; however, the bulk of plaintiff's claimed damages

In addition to refusing, despite notice from the court, to supplement its submissions in connection with the issues of income and alleged nationwide activities, the record contains numerous other gaps in the evidence, many hidden behind conclusions offered in the affidavit of the plaintiff's president.[9]

---

would appear to be lost profits from operations over the two year period between the fire and the filing of the complaint.  If plaintiff intends to make a claim for losses from operations in Alabama since the fire, it will certainly wish to prove its annual revenue prior to the fire; out of a total of 1.8 million dollars lost from the company's Alabama operations, it is likely that more than half a million dollars for each of the two years since the fire is sought as lost profits.  The $58,000 figure for Illinois in the first two months of this year is "net income" and can not be cogently compared to the *profits* lost due to the disruption of the Alabama operation; nonetheless, this rough estimate shows the need for the hidden income information.  Plaintiff attempts to blind the court to this disparity between plaintiff's Alabama-based income and its Illinois income, trying to maintain the fiction that the *relevant* Alabama revenues are substantially less than those of its Illinois operations.  Given the apparent size of the hidden income information, the court can not confidently find that jurisdiction exists without that information.

   [9]  A non-exhaustive list of some other examples of conclusions offered in the Carr affidavit in place of specific facts include:
   ●Carr provides a conclusory description (id at 2-3) of the kinds of work the Alabama employees usually do, with no indication of how that fits into the corporation's overall business, and no details on how that compares to what is done–how often, how importantly to STR's business, etc.–in the 'nerve center,' and containing few facts from which the court can reach its own conclusion.
   ● Carr also lists (id at 3-4) the sorts of decisions, such as agency functions, business transactions, and contract negotiation, processing and recording, as well as "all" marketing for STR, with no indication what if any marketing is actually done for STR, or how often any of the other management functions are conducted, nor how the relate to the day-in-day-out functioning of its business.
   ● Carr says that he approves all purchases, of whatever type, for the company, id, but does not indicate how often these decisions are made: it is not clear whether this imprecise statement includes requests for things like paper towels and other regularly-used supplies that are somewhat more common than, say, requests for new locomotives or capital improvements.  Nor does Carr say who determines the need and submits the request to him.  If he is simply saying that he normally signs off on forms submitted by others, and only does so for large or uncommon expenditures, his claim is far less important than it sounds.
   ● Carr says that "all of STR's business and policy decisions are made in Illinois."  Id. at 4.  Though he gives as an example a decision to purchase a new short-line railroad–something

Where, as here, serious limitations in the record are created by the party bearing the burden of proof–particularly where, as here, the lack of relevant information appears to result from an intentional tactical decision–not only does that party take the risk of an inadequate record, but the court has a duty to determine whether the underlying facts lead to a conclusion contrary to that party's position. "[I]f the judge has reason to believe that he lacks jurisdiction he is not obliged, and indeed is not permitted, to close his eyes and assume a jurisdiction that he doubts he has." Prizevoits v. Indiana Bell Telephone Co., 76 F.3d 132 (7th Cir. 1996), reh'g and suggestion for reh'g en banc denied (Posner, J.).

> [T]he fact that limits on subject-matter jurisdiction are not waivable or forfeitable–that federal courts are required to police their jurisdiction–imposes a duty of care that we are not at liberty to shirk. And since we are not investigative bodies, we need and must assure compliance with procedures designed to compel parties to federal litigation to assist us in keeping within bounds.

Smoot v. Mazda Motors of America, Inc., 469 F.3d 675, 677-78 (7th Cir. 2006)(Posner, J.). The court's duty will not allow a determination that jurisdiction exists on the basis of such a limited record as presented by the party bearing the burden of proof on this issue.

### B. Information Found to be Relevant to Determination of Corporate Citizenship

As set forth in some detail in the original Report and Recommendation, this Circuit determines the citizenship of a corporate party by application of the "total activities" test, an

---

which seems unlikely for STR to do rather than the parent holding company–or make any other investment, this conclusion does not indicate whether this is a significant part of STR's operations.

Carr even offers his opinion on the citizenship issue, based on his years of experience working with the parent holding company. Id.at 5. There is little way on the limited record presented for the court to cogently compare the work actually done and determine how the activities fits into STR's business as a whole. Carr's conclusions–with few specific facts to support them–hinder this court in understanding the plaintiff's actual business operations and in reaching its own conclusions on the jurisdictional issue.

amalgam of the "nerve center" and "place of activities" tests utilized in other circuits.  See

MacGinnitie v. Hobbs Group, LLC, 420 F.3d 1234, 1239 (11th Cir.2005).  Though which facts

are most relevant is different in every case,[10] a review of cases applying this test and its

component parts are instructive as to the amount and type of information which should be placed

before the court by a party attempting to demonstrate the existence of jurisdiction.

     In order for the court to apply the total activities test with sufficient assurance to justify

the exercise of diversity jurisdiction, the court should have sufficient evidence to understand the

corporation's business and structure in sufficient detail to justify the exercise of federal

jurisdiction.

> The "total activities" test has been very ably discussed and applied in several
> reported authoritative decisions. See e.g., Sweet Pea Marine, Ltd. v. APJ Marine,
> Inc., *supra*, 411 F.3d 1242; Toms v. Country Quality Meats Inc., 610 F.2d 313
> (5th Cir.1980); See, also, Bivens v. Equitable Life Assurance Society of the
> United States, ... 2000 WL 343178 [(M.D.Fla.); Mercury Finance Corp. of
> Alabama v. Aetna Casualty and Surety Co. of Illinois, 900 F.Supp. 390
> (M.D.Ala.1995). One consistent principle is that the "total activities" test is not
> intended to be mechanically applied. See Toms v. Country Quality Meats, Inc.,
> supra, 610 F.2d at 316 ("The 'total activity' test is not an equation that can
> provide a simple answer to the question of a corporation's principal place of
> business.")  Instead, **each activity and relevant factor, including the
> corporation's purpose, its management, and the location of its business
> activities**, must be examined in conjunction with each other so that the court, in
> the end, can step back and take a comprehensive and realistic look at the
> corporation as a whole, i.e. view the bigger picture, and make the ultimate
> determination of which state is central and predominant in the corporation's
> activities. **This determination must be made by considering not only where
> individual activities take place, but also the overall significance of the
> activities to the corporation as a whole**. See e.g., J.A. Olson Co., *supra*, 818
> F.2d at 411 (explaining that a court should consider where the most significant or
> predominant part of the corporation's business takes place based on the nature of

---

[10]  "These general rules, however, are only a starting point. In each case we must fully
examine the corporation's operations and its nerve center in the context of the organization of
that business." J.A. Olson Co. v. City of Winona, Miss., 818 F.2d 401, 411 (5th Cir. 1987).

the corporation's business and the significance of the activities to the
corporation's purpose).

Moll v. Allstate Floridian Ins. Co., 2005 WL 2007104 (N.D.Fla.)(emphasis added).

As the Fifth Circuit stated in Olson,

[i]n evaluating the "activity" of the corporation in question, one factor we must
consider is the nature of the activity: whether it is active or passive and whether it
is labor-intensive or management-demanding. We must consider the number of
locations where the corporation carries on its activities; obviously, the place of
operations of a corporation that carries on a single activity is more significant
than one of many places of operations of a corporation with diffuse activities.
Furthermore, we consider the importance of the particular activity to the corporate
purpose and to the corporation as a whole; significant indicators of an activity's
importance include the proportionate share of corporate assets, both of money and
time, devoted to the activity and the proportion of its income that the corporation
derives from that activity. We also see as significant the degree to which the
corporation's activities bring it into contact with the community.

J.A. Olson Co. v. City of Winona, Miss., 818 F.2d 401, 411-12 (5th Cir. 1987).

The court lacks fundamental information about plaintiff's business, information

necessary to consideration of such details into a "comprehensive and realistic look at the

corporation as a whole."  Id.  For example, the court can not even tell how STR makes most of

its money–whether its business is focused on running trains on a predetermined route and

schedule, which would tend to place the important work in the maintenance of the physical

assets and daily operation of the trains; whether STR merely lets others use its existing track for

a fee–a legitimate business model and in keeping with the lack of information on the number of

locomotives and cars owned and operated by plaintiff in Alabama and with the relatively low

number of employees; or whether it predominately brokers cargoes and similarly makes the bulk

of its income from other nerve center activities, which would clearly favor the location where

such business contracts are negotiated.  Carr's conclusions in a vacuum are inadequate to let the

12

court determine where the real work of STR takes place.   Some greater level of context is necessary to plaintiff's claim of jurisdiction and to overcome the court's presumption against its exercise.

Reading between the lines, as the court is unfortunately left to do in this case, it appears that Plaintiff STR consists in large part of one or more established Alabama short line railroads operating at least 60 miles of track and other facilities, plus 2.5 miles of track and other facilities which may also be considered a short line railroad in Illinois, bought by a holding company and reorganized to coordinate within Pioneer's corporate structure.   STR's business can thus be understood as principally involving the same sort of activities as the short line railroads previously conducted.[11]  If the Alabama portion of the operation is physically larger, has more employees, has more track, and–as appears reasonable from the claim for lost profits–historically out-earns the Illinois short line railroad operations when it is functional, it is an entirely reasonable conclusion that its principal place of business is Alabama.  Plaintiff argues that this finding does not contemplate the work done by the main office, but offers no indication of the frequency or importance of any such management services to the daily functioning and annual profits of STR.  Plaintiff can not complain that the limited record it has submitted does not provide a factual, evidentiary basis sufficient to support a finding of jurisdiction.

C. *Toms v. Country Quality Meats* and other authority

One often-cited case utilizing the "total activities" test is <u>Toms v. Country Quality Meats</u>

---

[11]  This understanding, though perhaps inaccurate given the lack of adequate facts, is supported by the record, and tends to indicate that the primary issues are how important each previously-separate part is to the operations of STR.

<u>Inc</u>., 610 F.2d 313 (5th Cir.1980).[12]  The <u>Toms</u> decision was summed up by the Fifth Circuit in

<u>J.A. Olson Co. v. City of Winona, Miss.</u>, 818 F.2d 401 (5th Cir. 1987):

> Country Quality, a Delaware corporation qualified to do business in Georgia, was one of sixty similar corporations created and managed by Brueggemeyer & Wolf (B & W), a Texas corporation.  Country Quality, like the other local corporations, was run by B & W, but paid local taxes, had a local bank account and had its own staff.  B & W, however, exercised almost total control over Country Quality in that it was authorized to discharge employees, it reviewed all sales reports, time cards and payroll sheets and it selected the suppliers from which Country Quality could buy its products.  We also noted that Country Quality was vested with so little managerial authority that its highest-ranking employee "wore an apron," that is, "was primarily engaged in meat cutting activities."  <u>Id.</u> at 315 n. 4.  Even though Country Quality had its only contact with the public in Georgia, we looked at the operation as whole.  The scenario was similar to that of a "far flung" corporation with a concentrated nerve center and diffuse places of activity.  Country Quality's operation represented only a single location of the many locations of the corporate activities;  the nerve center, however, was in one location.  We therefore held that the principal place of business was Texas, the "nerve center of the operation."

<u>Olson</u> , at 410.

Plaintiff argues that this case mandates a finding that STR and its parent and sister corporations be analyzed as a single entity, despite the corporate divisions.  Plaintiff argues that this is relevant because "[i]n a principal place of business analysis like this one, the Court must take a pragmatic approach and examine where STR's nerve center functions actually take place, without regard to who performs them."  Doc. 15 at 2-3.  In the analysis of the jurisdictional issue in this case, no question is presented concerning where plaintiff maintains administrative office, its 'nerve center.'

---

[12]    In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981), the United States Court of Appeals for the Eleventh Circuit adopted as binding precedent all decisions of the
former Fifth Circuit handed down prior to October 1, 1981.

What <u>Toms</u> actually held was that, for a corporation and its parent and sister corporations that operate as a single entity in a manner like that shown by the record in that case, the court could consider (1) the relevant nerve center functions even if they were performed outside of the corporate shell of the subsidiary being sued, and (2) that such a corporation could be deemed to be "far-flung" where its separately-incorporated parts were spread across the nation, allowing the nerve center aspect of the total activities test to predominate over the place of activities test. <u>Olson</u>, at 410.  Neither of these holdings has been shown to apply in this case.

Plaintiff has not demonstrated that its corporate structure was like that of Country Quality.  First, not all parent/subsidiary pairs qualify for such treatment.  "The court finds that <u>Toms</u> does not establish a hard-and-fast rule that every time a parent corporation exerts control over similar but separately-incorporated subsidiaries, the court must look to the "nerve center" to determine the principal place of business. "  <u>Mercury Finance Corp. of Alabama v. Aetna Cas. and Sur. Co. of Illinois</u>, 900 F.Supp. 390, 395 (M.D.Ala. 1995).  In <u>Mercury Finance</u>, the court considered details of the corporation's organization and its actual business procedures, and decided that the insurer's corporate family was not as unitary as the identical individual separate retail meat markets operated by the central authority of <u>Quality Meats</u>.  Part of the distinction made in Mercury Finance was the kind of business at issue–an insurer which only insured real property located in Florida.  That insurer was part of a larger insurance business, with other subsidiaries doing similar business in other states.

Second, the <u>Tom's</u> court made conclusions from the record about the nature of the corporations' activities and how the subsidiary fit into that structure; STR has submitted its president's affidavit which reiterates conclusions similar to those found by the <u>Toms</u> court,

15

instead of facts from which the undersigned could decide what conclusions were appropriate and what factors were most relevant.

In deciding how to balance the nerve center and place of activities tests, the nerve center test is generally more important with regard to "far-flung" businesses. "As we have earlier noted, nerve center considerations take on added significance when the activities of the corporation are far-flung or passive or management-oriented as opposed to labor intensive activities." Olson, at 412.

Looking at the entire Pioneer family of corporations (from the limited information provided to the court), it is not at all clear that STR and its parent and siblings should be analyzed like the meat markets in Toms, a single entity in which the corporate divisions are merely formal.[13]  A railroad, the purpose and existence of which are centered around its track and other physical assets, is a far more location-specific activity than a retail market.  There is likely to be far more difference between each subsidiary entity in a corporate 'family' of railroads than in a chain of meat markets.  The autonomy in the operation and maintenance of trains seems more akin to the activities of the captain and crew of a ship than to a chain store.  If the situation is otherwise, the only indication in the record of that difference are the inadequately-supported conclusions of plaintiff's president on issues which the court is required do determine.  Plaintiff has not shown that the whole Pioneer corporate family should be considered integral to its operation so as to allow this court to consider plaintiff to be a "far-

---

[13]  Defendants original brief (doc. 6, brief at pp. 16-17 and notes 3, 4 and 5) included citations to authority holding that a railroad is centered where its major railroad assets are primarily located, and where it makes its money; the reasoning is instructive, though not authoritative for a court in this Circuit.

flung" operation.

Looking only to the operations of STR, it exists in only two states, one of which has the most extensive railroad facilities and the other of which has less than five percent of the amount of track but also contains the corporate offices.  Under the definition of "far-flung" used by the courts, this corporate entity does not qualify.

> We have adopted the 'total activities' test to determine a corporation's principal place of business. See Vareka Investments, N.V. v. American Investment Properties, Inc., 724 F.2d 907, 910 (11th Cir. 1984). Under this test, if a corporation conducts the **vast majority** of its physical operations in a particular state, that state will contain its principal place of business; however, if a corporation's physical activities are negligible or are dispersed across several states, "the nerve center, or corporate offices, will be the principal place of business." See Toms v. Country Quality Meats, Inc., 610 F.2d 313, 315 (5th Cir. 1980) (emphasis added).

MacGinnitie v. Hobbs Group, LLC, 2005 WL 2787316 (11th Cir.)(emphasis added).

> Nevertheless, acknowledging that AFIC conducts business activities in more than one state does not mean that its activities are 'far-flung.' **A corporation will generally be considered 'far-flung' when the corporation is engaged in activities "dispersed to the point that no place in which the corporation conducts operations or activities can be denoted principal."** J.A. Olson Co., *supra*, at 407.  See also Tosco Corp. v. Communities for a Better Env't, 236 F.3d 495, 500 (9th Cir.2001)(The nerve center test should only be applied "if no state contains a **substantial predominance** of the corporation's business activities.").

Moll v. Allstate Floridian Ins. Co., 2005 WL 2007104 (N.D.Fla.)(emphasis added).

Because STR is not 'far-flung', the place of activities portion of the total activities test is generally entitled to greater weight than the nerve center test in determining its citizenship. MacGinnitie, at 1239.  The court has set forth, here and in the original Report and Recommendation, the factors supporting its position that the place of activities portion of the test requires a finding that Alabama is the principal place of business of the plaintiff railroad, and why the nerve center analysis does not alter that conclusion.  The court has also stated why it

17

believes that the plaintiff has failed to bear its burden of proof so as to warrant a different conclusion, one that would allow the exercise of federal jurisdiction over this action. Nothing in the Amended Complaint or since its filing has altered those basic findings or the original recommendation that this action be dismissed for lack of jurisdiction. The undersigned RECOMMENDS that the court find that plaintiff has failed to demonstrate that the parties are diverse and thus that the court lacks jurisdiction under the diversity of citizenship theory of jurisdiction.

*Defendants' Alternative Motion for Jurisdictional Discovery*

Both of defendants' Motions to Dismiss seek alternative relief as well. In the event that the court rejects their arguments based on the record as it now stands, defendants ask for the opportunity to conduct discovery on the jurisdictional issues before a final determination on their motions to dismiss. All information concerning the corporation's operations, assets, etc. are within the control of the plaintiff. The record before the court consists, to a large degree, of evidence selectively offered by plaintiff, and has been artificially limited to bolster plaintiff's claim of jurisdiction.

The affidavit of Michael Carr (doc. 11, exhibit A), president of STR and its parent corporation, constitutes the primary–and very nearly sole–evidence submitted. Plaintiff argues, on that basis, that in effect the court is required to accept every bit of that affidavit at face value, because there is no contrary evidence. (Doc. 21 at 2)[14] Without jurisdictional discovery,

---

[14] "None of the facts stated in the Carr affidavit are disputed by Defendants; Defendants merely dispute what conclusion should be reached based on the facts submitted. Therefore, the Court is not called on in this instance to discern the truth from contradictory evidence, but only to weigh the undisputed facts and determine where STR's principal place of business is located." Id.

defendants cannot reasonably be expected to offer significant contrary evidence of plaintiff's corporate structure, management or operations, nor even to fill in the blanks left by the affidavit. Accepting Carr's factual statements as true, as far as they go, the court must not abandon its duty to determine the whole picture.  The affidavit contains Carr's self-serving conclusions and very limited facts which do not give the court that level of understanding.

Because the undersigned found that plaintiff clearly failed to establish that it was completely diverse from the defendants and thus the existence of jurisdiction under that theory, the original Report and Recommendation addressed this alternate remedy in passing.  However, should the district court find that plaintiff has arguably borne its burden of persuasion, defendant should be allowed an opportunity to discover facts from defendant which are relevant to this issue, including, without limitation, income figures for the Alabama and Illinois railroad operations over a period of time that includes the period before the damage to the line foreclosed any and all operating income from the Alabama operations; the identity of all entities which have been merged into plaintiff STR; the extent and frequency of plaintiff's nationwide activities through the American Short Line and Regional Railroad Association; details concerning plaintiff's corporate structure; the frequency and extent of management's involvement in STR's railroad operations; and details of the relationships among STR and the other subsidiaries of the parent holding company.

The undersigned thus RECOMMENDS that, in the event the district court disagrees with the undersigned's initial conclusion and finds that defendants' Motions to Dismiss are not well-taken on the record as it exists, the court GRANT defendants' alternative motion for jurisdictional discovery.

<u>Conclusion</u>

For the foregoing reasons, the court supplements its prior Report and Recommendation as set forth above, and RECOMMENDS that the court find that plaintiff has failed to demonstrate the existence of jurisdiction, GRANT defendants' Motion to Dismiss (doc.  24), and DISMISS this action without prejudice on the grounds that the court lacks jurisdiction.

The attached sheet contains important information regarding objections to the Report and Recommendation.

**DONE** this the <u>18th</u>  day of August 2009.

 /s/ Katherine P. Nelson     
**KATHERINE P. NELSON**
**UNITED STATES MAGISTRATE JUDGE**

MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS
AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
AND FINDINGS CONCERNING NEED FOR TRANSCRIPT

1.      Objection.  Any party who objects to this supplemental recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the clerk of court.  Failure to do so will bar a de novo determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge.  See 28 U.S.C. § 636(b)(1)(C); Lewis v. Smith, 855 F.2d 736, 738 (11th Cir. 1988).  The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides, in part, that:

A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed de novo and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.      Opposing party's response to the objection.  Any opposing party may submit a brief opposing the objection within ten (10) days of being served with a copy of the statement of objection.  Fed. R. Civ. P. 72; SD ALA LR 72.4(b).

/s/_____
**KATHERINE P. NELSON**
**UNITED STATES MAGISTRATE JUDGE**

21